IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | No. 20 cr 704 |
| v. | ) | |
| | ) | Chief Judge Virginia M. Kendall |
| ADAM BLOCKER | ) | |

**<u>SENTENCING MEMORANDUM</u>**

To start from a point of agreement: Adam Blocker committed a serious crime. Mr. Blocker recognizes that his offense—the possession and exchange of child pornography—was not victimless. He fully understands that his offense warrants a punishment that includes a significant term of incarceration.

But, in this case, the Sentencing Guidelines do not provide a good starting point for determining what Mr. Blocker's sentence should be. As the Sentencing Commission has repeatedly acknowledged, the non-production child pornography guidelines are deeply flawed because they fail to "meaningfully distinguish between more and less culpable offenders." United States Sentencing Commission, Federal Sentencing of Child Pornography Non-Production Offenses at 19 (2021), https://www.ussc.gov/research/research-reports/federal-sentencing-child-pornography-non-production-offenses [hereinafter "Non-Production Research Report"].

Rather than rely on these flawed guidelines, the Court should determine an appropriate punishment based on its independent consideration of the Section 3553(a) factors. As part of that § 3553(a) analysis, the defense would ask the Court

1

to consider several significant mitigating facts. For one, Mr. Blocker is a true first-time offender. *See* PSR at ¶ 44. In addition, Mr. Blocker has successfully demonstrated his rehabilitation during the four years that he has spent on pretrial release. During this time, multiple mental health evaluators have concluded that Mr. Blocker poses a minimal risk of recidivism. For instance, after treating Mr. Blocker for years, his Court-appointed therapist "do[es] not believe that Mr. Blocker is attracted to children and does not seek out contact with children." PSR at ¶ 63; *see also* Exh. F, Neuropsychological Evaluation, at 48.[1]

Along with those factors, the Court also must weigh the seriousness of the offense. And this offense is undoubtedly serious. At the same time, it is worth stressing that Mr. Blocker's case lacks a number of aggravating features that are frequently present in non-production child pornography cases. Unlike many defendants, Mr. Blocker does not have any prior history—charged or uncharged—of sexual misconduct. Moreover, Mr. Blocker was not deeply involved in a child pornography community, and he engaged in viewing child pornography for a period of about 9 months. Of course, that is still far too long. But it does favorably distinguish this case from those in which the defendant has demonstrated a life-long paraphilic interest in children. These considerations provide further evidence that Mr. Blocker is unlikely to recidivate.

Based on these considerations, the defense would respectfully suggest that the

---

[1] This evaluation, as well as the character letters in support of Mr. Blocker will be submitted to the Court and provided to the government under separate cover.

Court sentence Mr. Blocker to 72 months of incarceration. A 72 month sentence would be a harsh, but appropriate, punishment for a first time offender who has already demonstrated significant rehabilitation.

## DISCUSSION

The PSR calculates that Mr. Blocker faces an advisory guidelines range of 210–262 months of incarceration. *See* PSR at ¶ 80. The defense does not dispute that that this calculation is technically correct. But—for reasons that the Sentencing Commission has itself repeatedly articulated—the defense believes that these guidelines are deeply flawed and should not influence the Court's sentencing determination in this case.[2] This memorandum will start by discussing the problems with the current version of U.S.S.G. §2G2.2. The defense will point out that, if the Sentencing Commission was free to implement its own, empirically grounded recommendations to Congress, Mr. Blocker would likely face an advisory range of somewhere around 63–78 months.

After discussing the flaws in the sentencing guidelines, Mr. Blocker will turn to the Section 3553(a) factors. In particular, the defense would ask the Court to consider three main points in mitigation.

*First*, Mr. Blocker's difficult childhood—in which his parents continually shamed and stigmatized him for being gay—led him to develop severe anxiety and compulsivity disorders. At the time of the offense, Mr. Blocker had never received

---

[2] It is worth noting that Probation has also recommended a below-guidelines sentence in this case, based on both Mr. Blocker's personal characteristics as well as the fact that "several of the enhancements . . . are excessively punitive, given changes in technology over the years."

treatment for those mental health issues, but instead responded to his mental health struggles by sinking into pornography and substance abuse addictions. That history provides context for why Mr. Blocker engaged in this offense and it also helps to explain what is needed to ensure that this offense will never happen again.

*Second*, Mr. Blocker's exceptional performance on bond for the last four years shows that—when he receives meaningful mental health treatment—he is fully capable of living a successful and law-abiding life. That is the judgment of the multiple mental health providers who have evaluated Mr. Blocker over the last four years. *See* PSR at ¶ 63 (noting that Mr. Blocker 's Court ordered treatment provider "do[es] not believe that Mr. Blocker is attracted to children and does not seek out contact with children"); *see also* Exh. F, Neuropsychological Evaluation, at 48. And Mr. Blocker's rehabilitation is further evidenced by his complete compliance with the Court ordered conditions of release; his stable, age-appropriate romantic relationship; and his maintenance of a steady job.

*Third*, placing Mr. Blocker's offense in the broader context of non-production child pornography cases prosecuted in this district demonstrates that a 72-month sentence would be appropriate here. As the Sentencing Commission has noted, non-production child pornography cases can be meaningfully distinguished by examining: (1) the "nature of the offender's collecting behavior," (2) "the offender's degree of involvement in an internet *community* devoted to child pornography and child sexual exploitation" and (3) "the offender's engagement in sexually abusive or exploitative *conduct* in addition to the child pornography offense." Non-Production Research

4

Report at 28 (emphasis in original). When judged on these three metrics, Mr. Blocker's offense is less aggravated than many of the cases that this Court sees. Overall, these factors support the conclusion that a 72-month sentence would constitute a just punishment for Mr. Blocker and would be proportionate to the sentences that have been imposed in similar cases.

**A.     The Court should not rely on arbitrary guidelines that the Sentencing Commission has repeatedly criticized. Under the Commission's preferred, evidence-based approach, Mr. Blocker's guidelines range would likely be around 63–78 months.**

For years, courts have recognized that the non-production child pornography guidelines are deeply flawed. *See, e.g.*, *United States v. Dorvee*, 616 F.3d 174, 188 (2d Cir. 2010) (describing U.S.S.G. §2G2.2 as an "eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results"); *United States v. Grober*, 624 F.3d 592, 603 (3d Cir. 2010) (collecting cases "across the country [finding] § 2G2.2 flawed"); *see also United States v. Price*, 775 F.3d 828, 841 (7th Cir. 2014) (affirming below-guidelines sentence based on district court's conclusion that the "guidelines call for enhancements that apply in nearly every case, exerting virtually automatic upward pressure on sentences and failing to separate less dangerous offenders from those who are more dangerous").

The Sentencing Commission has come to the same conclusion. Over the past 15 years, it has issued a series of reports criticizing §2G2.2.[3] The most recent of these

---

[3]     *See* United States Sentencing Commission, Federal Sentencing of Child Pornography Non-Production Offenses (2021), https://www.ussc.gov/sites /default/files/pdf/research-and-publications/research-publications/2021/ 20210629_Non-Production-CP.pdf; United States Sentencing Commission, Federal Child Pornography Offenses (2012), https://www.ussc.gov/sites/default

reports was published in 2021. *See* Non-Production Research Report. In that report, the Commission acknowledged that, due to the "outdated statutory and guideline structure, sentencing disparities among similarly situated non-production child pornography offenders have become increasingly pervasive." *Id.* at 7. In particular, the Commission noted that four of the guideline's six sentencing enhancements "apply in the vast majority of non-production child pornography cases . . . [and] fail[] to distinguish adequately between more and less severe offenders." *Id.* at 19. The 2021 report concluded by reiterating the Commission's request that it be allowed to promulgate "a properly calibrated guideline that jettisons outdated factors." *Id.* at 69.

The Court has the discretion to consider the Sentencing Commission's recommended changes to §2G2.2, which would result in a significantly more appropriate sentence for Mr. Blocker. A table, summarizing the effect of the Sentencing Commission's recommendations, is included below:

---

/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212
-federal-child-pornography-offenses/Full_Report_to_Congress.pdf [hereinafter
"Report to Congress"]; United States Sentencing Commission, *History of the
Child Pornography Guidelines* (2009), https://www.ussc.gov/sites/default/files
/pdf/research-and-publications/research-projects-and-surveys/sex-offenses
/20091030_History_Child_Pornography_Guidelines.pdf.

| Alternate Guidelines Calculation | | |
|---|---|---|
| | Actual Guidelines | Proposed Calculation Based on Sentencing Commission Research |
| Base Offense Level | 22 | 22 |
| Under 12 years of age | +2 | |
| Distribution for non-pecuniary gain | +5 | +5 |
| Sadomasochistic Images | +4 | +4[4] |
| Use of Computer | +2 | |
| Number of Images | +5 | |
| Zero-Point Offender | | -2[5] |
| Acceptance of Responsibility | -3 | -3 |
| Resulting Range | 210–262 months | 63–78 months |

This alternate calculation continues to account for the aggravating features of Mr. Blocker's offense, through the application of §2G2.2(b)(3)(B) and (b)(4)(B). But— following the Sentencing Commission's recommendations—this alternate calculation jettisons several enhancements that no longer meaningfully bear on a defendant's culpability.

---

[4]     To be clear, the Sentencing Commission has also recommended the elimination of this 4-level enhancement because it applies in 84% of all cases. *Id.* at 19; *see also* Report to Congress at 322–323. Certainly, there is a strong argument that the ubiquity of this enhancement means that it no longer distinguishes between offenders. Having said that, the defense recognizes that the nature of the images is appropriately considered as an aggravating factor. In this sense, the alternate calculation presented above is harsher than the one urged by the Sentencing Commission itself.

[5]     The Zero Point Offender guideline was promulgated after the publication of the Sentencing Commission's child pornography reports and was therefore not specifically addressed in any report. However, the empirical findings of those reports, specifically the finding that "revocation data for all federal offenders appear generally consistent with the Commission's finding concerning the general recidivism rate by child pornography offenders," supports applying the generally applicable zero point offender reduction here. Report to Congress at 309.

7

As the Supreme Court has noted, the Sentencing Commission's judgments typically deserve careful consideration because the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise.'" *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (quoting *United States v. Pruitt*, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)). In the ordinary case, the Commission's institutional expertise explains why courts continue to give respectful consideration to the advisory guidelines range, even after *Booker*.

But here, those same institutional considerations cut in the opposite direction. This Court should not place stock in a guidelines range that the Sentencing Commission has repeatedly disclaimed and attempted to amend. Instead, to the extent that the Court wants to make use of the Sentencing Commission's institutional expertise, it should give serious consideration to the alternate calculation—specifically, the 63 to 78 month range—discussed above.

With that comment on the guidelines, the defense now turns to how the Court should weigh the § 3553(a) factors in this case.

**B.      Mr. Blocker's unstable childhood led to the development of untreated psychiatric problems, including anxiety and compulsivity disorders. This offense should be understood in that context.**

While Mr. Blocker's material needs were provided for during childhood, his upbringing was otherwise unstable, unsupportive, and emotionally abusive. PSR at ¶ 50. His parents—especially his mother—were extremely young when Mr. Blocker was born. *Id.* They were not ready to be parents. They abused drugs and they partied

hard. *Id.* They would frequently leave Mr. Blocker behind with his grandmother or with their friends while they travelled to concerts or went on binges. *Id.*

Mr. Blocker's parents not only used drugs, but sold drugs as well. Officially, they "owned and operated a jewelry store," but much of their revenue came from "traffick[ing] narcotics," primarily marijuana, out of the back. PSR at ¶ 50. At home, things were equally complicated. His maternal grandmother was a racist, who openly disdained Mr. Blocker's Hispanic father (and who continues to have complicated feelings towards Mr. Blocker and her half-Mexican grandchildren). *Id.* Mr. Blocker's father was an alcoholic. *Id.* When his parents were drunk or high, their "verbal fights frequently escalated to physical altercations[.]" *Id.* Those were the conflicts that Mr. Blocker grew up having to navigate from a very young age.

Things became even more difficult in Mr. Blocker's teens, when he began to realize that he was gay. *Id.* at ¶ 51. Throughout his childhood, both of Mr. Blocker's parents loathed gay people. *Id.* His mother's homophobia was rooted in her strict (if somewhat idiosyncratic) religious beliefs. She told her son that she found homosexuality to be sinful and disgusting. His father was less religious, but—as Mr. Blocker understands it—his homophobia was rooted in a kind of machismo. He was "openly hostile to customers at the jewelry store that he believed were homosexual." PSR at ¶ 51. His parents directed their anti-gay hostility at Mr. Blocker as well—berating him when he cried or acted "feminine." Exh. F, Neuropsychological Evaluation, at 45.

Mr. Blocker reacted to his parents' homophobia by trying to hide and suppress his sexuality. *See* Exh. F at 10. This—combined with the chaotic circumstances of his childhood more generally—took a significant toll on Mr. Blocker's mental health. He began experiencing symptoms of clinical anxiety and depression when he was a teenager. *Id.* at 18–21. He struggled with suicidal thoughts like "'If I kill myself I don't have to tell anyone I am gay' and 'I felt like it would be better to just off myself than be gay.'" *Id.* at 12; *see also* PSR at ¶ 61 (noting Mr. Blocker's suicidal ideation during his teenage years). In addition to suicidality, Mr. Blocker developed many of the classic features of anxiety disorder, including "a sense of isolation, negative self-esteem, lack of positive influences, little awareness and acumen into his actions, sleep disturbances, and the development of negative coping habits." Exh. F at 9.

Chief among these negative coping habits was pornography addiction. While Mr. Blocker was too ashamed to tell his family or friends that he was gay, he secretly and compulsively viewed pornography. *See* PSR at ¶ 64; Exh. F at 10. By high school, Mr. Blocker was masturbating 2 or 3 times every night, and watching pornography for hours on end. *Id.* While this pornography addiction and compulsive masturbation was not illegal, it reflected Mr. Blocker's deeper mental health struggles.

In particular, this obsessive masturbation was an expression of what the DSM describes as "Compulsive Sexual Behavior Disorder." *Id.* at 25–26. Just as some people use drugs or alcohol to alleviate (or at least forget) their feelings of depression and anxiety, Mr. Blocker was using pornography. In other words, Mr. Blocker turned to pornography and masturbation as a "self-soothing behavior" that he used to

"reliev[e] anxious thoughts and [to feel] in control of his identity." *Id.*

Mr. Blocker's mental health struggles were compounded by a series of family tragedies that occurred when he was a teenager. When he was around 16, his mother suffered from a severe stroke—the first in a series that would eventually leave her mostly paralyzed. PSR at ¶ 53 (noting that she is currently "paralyzed on the left side of her body, from her neck downwards). Two years later, when Mr. Blocker was 18, his father died of liver failure. *Id.* at ¶ 52. Mr. Blocker blamed himself for his father's death, and he started to drink heavily and experiment with marijuana and psychedelic drugs. *Id.* at ¶¶ 52, 66–67.

Mr. Blocker's heavy drinking in response to his father's death marked the beginning of a downward spiral. His mother, unhappy with the direction that his life was going, kicked him out of the house. *Id.* at ¶ 53. As a result, Mr. Blocker was homeless for much of his early 20s. *Id.* He spent several months sleeping in his car and then several years couch surfing with friends. *Id.* He worked entry level jobs—at PetSmart, then at McDonalds, and eventually at Buffalo Wild Wings. PSR at ¶ 75. There were times when he did not have enough money for food or for clothing. *See* PSR at ¶ 53. None of this helped with Mr. Blocker's lack of self-esteem or clinical anxiety disorder. He hated being the "couch guy" who mooched off of his friends and co-workers and he was stressed out by thinking about "where [his] life was going[.]" Exh. F at 12. But rather than seek treatment for these feelings, Mr. Blocker tried to drown them out.

On one occasion during this period, Mr. Blocker had an acute panic attack that

11

required hospitalization. PSR at ¶ 62. While this should have been a wakeup call, Mr. Blocker still did not seek therapy or mental health treatment. Instead, he continued to bury his problems with the same self-destructive "self-soothing" mechanisms that he had relied on for years—alcohol, marijuana, and compulsive pornography use. Indeed, his reliance on these compulsive behaviors intensified over time.

Around the start of 2018, Mr. Blocker (encouraged by some of his co-workers) started experimenting with cocaine. PSR at ¶ 67. Unsurprisingly, cocaine use further "impacted his judgment and decision-making abilities." Exh. F at 38. Several months later, Mr. Blocker's compulsive sexual behavior—which was serving a similar function to his drug and alcohol abuse—escalated as well. It was around that time, in the spring of 2018, when Mr. Blocker began to view child pornography. Mr. Blocker knew that it was wrong, and it only intensified his feelings of self-disgust and self-loathing. But—for reasons that are related to his longstanding struggles with compulsive and addictive behaviors—he only gathered the willpower to stop viewing it after the FBI came to his house in February 2019.

**C.**   **Mr. Blocker's lack of criminal history, exceptional performance on bond—as well as the judgment of multiple mental health professionals—all suggest that he poses a minimal risk of recidivism.**

As explained in the previous section, this offense was the culmination of Mr. Blocker's lifelong struggles with untreated depression, anxiety, and (especially) compulsivity disorders. Of course, these conditions provide no excuse for his offense. But the defense discussed them at length because they are important for understanding why this offense occurred and why it is unlikely to reoccur, given the

changes Mr. Blocker has made in his life.

In this section, the defense will discuss the significant changes that Mr. Blocker has made in the six years since the FBI searched his house in February 2019. During this period, Mr. Blocker demonstrated that—with appropriate treatment—he is fully capable of leading a law-abiding life.

To some extent, these positive changes started even before Mr. Blocker was formally charged in this case. There was a 20 month gap between the FBI's search of Mr. Blocker's house in February 2019 and his ultimate arrest in October 2020. During those 20 months, Mr. Blocker did not view child pornography, and no new evidence was uncovered at the time of his arrest. Admittedly, that is a very low bar. But it is a bar that more culpable defendants often fail to clear. *See, e.g.*, *infra* at 17 (discussing the defendant's post-detection efforts to continue viewing child pornography in *US v. Fortenberry*). It provides some evidence that the aim of specific deterrence has already been achieved in this case.

Moreover, Mr. Blocker's rehabilitation accelerated once he was placed on pretrial release in October 2020. He has not received a single violation report in that time. *See* Dkt. 135. As his pattern of clean drug tests demonstrates, Mr. Blocker has entirely stopped his use of illegal substances. *Id.* In addition, Mr. Blocker has stopped consuming internet pornography altogether. Cutting out these compulsive and self-destructive behaviors has yielded immense benefits for Mr. Blocker.

In the last five years, he has managed to overcome the financial instability of his early 20s. At present, he works as a kitchen manager, where he is in charge of

13

supervising "the staff and the supplies[.]" PSR at ¶ 72. And his employer has expressed interest in further promoting him to be a sous chef or executive chef. *Id.* Mr. Blocker has made significant strides in his personal life as well. His commitment his boyfriend has deepened into a long-term and supportive relationship. *See* Exh. B, Letter from Robert Brown (Boyfriend). While Mr. Blocker's relationship with his family remains complicated, things have improved on that front as well. Since 2020, Mr. Blocker has served as the primary caregiver for his disabled mother and sick grandmother—running errands for them, cooking, cleaning, and otherwise helping to provide for their needs. *Id.* at ¶ 53; *see also* Exh. C, Letter from Trudy Blocker (Grandmother) (discussing how Mr. Blocker assisted her with her cancer treatment).

All of this bodes well for Mr. Blocker's future. The Sentencing Commission's review of the recidivism research in the non-production child pornography context has found that that the rate of sexual recidivism is not "as high as commonly believed." Report to Congress at 293. Recidivism rates are especially low for defendants—like Mr. Blocker—who have been in the community without incident for more than five years. *Id.* at 301. But, ultimately, the question before the Court at sentencing is not about general rates of recidivism. It is about assessing the specific individual who stands before the Court.

To that end, it is worth considering the letters from the people who have known Mr. Blocker for years and who have seen his dramatic change for the better. As Mr. Blocker's boyfriend explains in his letter to the Court, "Adam has grown a lot. He has gone from not realizing he has an addiction (porn), to actively seeking help, going

14

to therapy, and continuing his efforts [at] recovery." Exh. B, Letter from Robert Brown (Boyfriend). A similar theme can be detected throughout the other character letters. *See, e.g.*, Exh. D, Letter from George Myers (Co-worker) ("He has grown into a fantastic manager and an even better friend over the course of the four years I have known him."); Exh. E, Letter from Luis Gutierrez (Former Boss) (noting the "tremendous growth in his emotional wellbeing").

In addition to these character letters, the Court should also consider the more objective—and, therefore, perhaps more useful—perspective of the mental health professionals who have assessed Mr. Blocker during his time on pretrial release. As a condition of his Court supervision, Mr. Blocker has been required to attend regular mental health treatment sessions since 2020. These therapists are chosen by Pretrial Services, and it goes without saying that defense counsel plays no role in their selection. Based on the experience of treating Mr. Blocker for years, his counselor informed Probation that he does "not believe that Mr. Blocker is attracted to children and does not seek out contact with children." *Id.* at ¶ 63.

The defense has had Mr. Blocker evaluated as well. That evaluation is long and has been attached as Exhibit F. Its bottom line conclusion is that Mr. Blocker "is Amenable to Treatment[.]" *Id.* at 48. In particular, Dr. Paret's report concluded that Mr. Blocker's offense was driven by mental health disorders—specifically, the depression, anxiety, and compulsivity disorders described above—that can be effectively treated. *Id.* at 48–49.

Of course, the fact that these conditions are treatable does not mean that

15

dealing with mental health problems is easy. The defense acknowledges that Mr. Blocker will continue to need support for years to come. But that support is available. To some extent, Mr. Blocker will receive it from the Bureau of Prisons (though only at the tail end of his sentence). But, more importantly, Mr. Blocker will receive this support while he is on supervised release in this district. The past four years demonstrate that Mr. Blocker will take advantage of this support and will continue to be successful after his release from custody.

**D.    Comparing Mr. Blocker's offense to other recent cases demonstrates that a 72 month sentence is an appropriate and proportionate punishment.**

In an ordinary case, the sentencing guidelines play an important role in avoiding such disparities. *See United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021) (recognizing the guidelines role in avoiding sentencing disparities). But in the child pornography context, the opposite is true. As the Sentencing Commission has explained, the structural flaws in §2G2.2 have resulted in "sentencing disparities among similarly situated non-production child pornography offenders [becoming] increasingly pervasive." 2021 Report at 7.

Because the Court cannot rely on the guidelines as a way to avoid unwarranted disparities, it should consider the actual sentences that have been imposed in similar federal cases. The national sentencing statistics provided by the Sentencing Commission provide some insight on this. *See* U.S.S.G., Interactive Data Analyzer, https://ida.ussc.gov/analytics/saw.dll?Dashboard. These statistics show that, in 2023, the median sentence imposed in a non-production child pornography case was 97 months. Of course, these general statistics include cases that involve a wide variety

16

of offense conduct—including aggravating conduct that is not present in this case. In the interest of making more granular comparisons, the defense would also suggest that the Court consider the sentences that were imposed in two recent, and relatively similar, child pornography cases that were before this Court.

First, in *United States v. Fortenberry*, 22-cr-435, this Court sentenced a defendant who had downloaded more than 116,000 child pornography files over the course of several years. *See* Plea Agreement, *United States v. Fortenberry*, 22-cr-435 (N.D. Ill. Sept. 226, 2022) (Dkt. 8). That is more than *20 times* the amount of child pornography at issue in this case. *See* PSR at ¶ 31. In addition, Mr. Fortenberry's involvement in a child pornography "community" was far greater than Mr. Blocker's. As Mr. Fortenberry's own defense counsel explained, Fortenberry regarded himself as part of a "sophisticated, computer savvy secret family" who could look at child pornography on the dark web with impunity. Def. Sent. Memo., *Fortenberry*, Dkt. 36 at 4. Even after the FBI contacted him, Mr. Fortenberry used his sophisticated computer skills in an attempt to destroy evidence and to preserve his continued access to child pornography. Plea Agreement, *Fortenberry*, Dkt. 8. The Court ultimately sentenced Mr. Fortenberry to 90 months of incarceration. Because Mr. Blocker's offense involved significantly fewer images and well as less technological sophistication,[6] the defense would suggest that a slightly lower sentence would be appropriate here.

---

[6] It is true that—given Mr. Fortenberry's use of the "dark web"—the government had no direct evidence of distribution in that case. But the defense would make the following point: it is simply not possible to amass a collection of 116,000

17

The second case that is worth considering is *United States v. Hancock*. *See* Plea Agreement, *United States v. Hancock*, 13-cr-217 (N.D. Ill. Nov. 14, 2013) (Dkt. 28). In that case, Mr. Hancock was held responsible for 16,000 images and 1,233 videos of child pornography. *Id.* at 4. Moreover, Mr. Hancock admitted that he had been viewing child pornography for 12 or 13 years—essentially the entirety of his adult life. *See* Sent. Tr., *Hancock*, 13-cr-217, Dkt. 80 at 91:8–11. On top of that, Mr. Hancock was a member of a password-protected, invitation only community that was exclusively dedicated to sharing child pornography. *See* Def. Sent. Memo., *Hancock*, 13-cr-217, Dkt. 48 at 18 ("Hancock was invited into an established child pornography community others created on Gigatribe."). And finally, Mr. Hancock hacked into his ex-girlfriend's boyfriend's computer and attempted to pin the blame for the offense on this other person. *See* Sent. Tr., *Hancock*, 13-cr-217, Dkt. 80 at 92:13–94:1. As the Court put it, that contact demonstrated "a manipulation that's greater than simply passive assuaging one's behavior in the privacy of one's own home." *Id.*

Ultimately, the Court sentenced Mr. Hancock to 120 months. *Id.* at 96:23–25. The defense would respectfully suggest that Mr. Blocker's offense was less aggravated across the board—Mr. Blocker's offense involved fewer files, took place

---

child pornography images without either (a) trading child pornography or (b) paying cash. If Mr. Fortenberry traded images, then he was a distributor. The fact that he used his technological skills and membership in a "computer savvy secret family" to evade detection is aggravating, not mitigating. If Mr. Fortenberry paid cash, then it is at least arguable that he did more to fund and maintain a market for child pornography than did Mr. Blocker's entirely non-commercial conduct.

over a shorter period of time, and had a lower level of involvement in any kind of child pornography community. As a result, a shorter sentence would be appropriate here.

## CONCLUSION

The defense respectfully suggests that a 72 month sentence would appropriately balance the seriousness of the offense with the significant mitigation that is present in this case. That would be a long sentence for a defendant who has never been incarcerated before, and who has already started to turn his life around. The Court should find that it is a sufficient, but not greater than necessary, punishment for Mr. Blocker.

Respectfully submitted,

FEDERAL DEFENDER PROGRAM
John Murphy
Executive Director

By:     /s/ *William Hardwicke*
William Hardwicke
Attorney for Adam Blocker

WILLIAM HARDWICKE
FEDERAL DEFENDER PROGRAM
55 E. Monroe Street, Suite 2800
Chicago, Illinois 60603
(312) 621-8302

19